Good morning, Your Honors. If it may please the Court, Philip Garrett Panitz on behalf of the Petitioner, Harrison & Sons. Your Honors, I've argued many, many cases to the tax court, and I have to say that this is probably the most frustrating case I've ever argued to the tax court. I had the sense in this appearance that the tax court judge had a preconceived notion that a 70-year-old woman could not possibly be running this corporation. And despite all the evidence that was presented, and despite all the testimony that was presented, the judge insisted upon fitting a square peg into a round hole. And that's what happened down there. We presented city council people, mayors, all of them testified that Mrs. Harrison was not only the public face of the company, but integral to the company and the awarding of contracts. And also, the judge even stated in his opinion that he found that she worked over 40 hours per week, that she was the founder, co-founder of the company in 1932, that she had worked continuously for the company for over 70 years. It's hard to figure out what she was doing 40 hours a week. If you look at the work that the judge said she was doing, it seems she was going around to As the testimony indicated, she was reviewing contracts, she was reviewing bills, she was paying bills, she was appearing in community events, she was a member of seven different chambers of commerce. The way it works is a trash hauling company gets municipal contracts from each of the government entities, and she was the and each one of them were willing to come down and testify that she was Harrison and Sons. Basically, she attended all the board meetings, she voted on all issues, she provided the capital backing for the company, including a $7.5 million loan that was guaranteed by her assets to Bank of America to expand the company when they purchased additional trusts. I'm not sure what a chairman of the board of a company could do more than that than to have this judge determine that she's more akin to an outside director. How could she be more akin to an outside director? Does an outside director work in a company for over 70 years and be one of the co-founders of the company that built the company from nothing to a company that's making $27 million a year? I mean, there's, she devoted herself to the company, despite, and he found that not only was she working 40 hours, that she was working 40 or more hours per week. This is the judge's opinion, finding this fact. If she was the public face of the company, is that something that an outside director would be doing? Is an outside director the public face of the company? Is an outside director pledging $7.5 million of their own assets to fund expansion? What exactly is an outside director anyway? Isn't it somebody who's esteemed in the community and lends credence to the viability of the company by sitting under directors, but usually with very little stake in the outcome of the company? Certainly not the co-founder, the president and the chairman of the board. There was no evidence presented by the petitioner or by the IRS that Mrs. Harrison acted akin to an outside director. Look at famous directors. Michael Eisner was the chairman of the board of Disney Corporation. Was he in the back room crunching numbers like one of her sons was doing or checking on the trucks, let's say? I mean, he is the public face of the company. He sets the policy of the company. He meets in board meetings and makes sure that his directors and officers are following that policy and implementing it. That's what a director does. He sets the policy and the tone of the company. In fact, when the judge even asked Myron Harrison, the oldest son, asked him, well, give me an example of an instance where, you know, your mother set certain policy in the company and Myron said, well, we had come to a board meeting. We wanted to expand. We wanted to buy new trucks. And she said no. And she said that we're just going to refurbish the trucks that we company. Well, she was a 55 percent shareholder, right? She was a majority shareholder. But when she was sitting in the board of directors, she wasn't voting her shares. No, I understand. It's a factual question. Now, amazingly in this case, the IRS expert determined that she was entitled to zero compensation. Now, what was that based on? The IRS expert's report said in his conclusion that she was entitled to zero compensation. And the zero compensation must have been based on an assumption that he made, since he never interviewed Mrs. Harrison or went to the company or asked a single question prior to his testimony in court, was an assumption that the IRS presented to this expert and said, what if we have a 70-year-old woman who is sitting at home collecting money from the company without doing any work for the company and doesn't come to the office, what would she be entitled to? That, in essence, was the assumption that this IRS expert was working under. Now, that may be the assumption that he was working under, but also the numbers that he came up with were either intentionally misleading or he was grossly incompetent. He testified in court that, in fact, he used average year equity for all his comparable companies, but yet when calculating the return on equity for Harrison and Sons, he used end-of-year equity. Well, how do you do that? How do you compare apples to oranges like that? If you're going to be fair, use the same consistent standard for your comparison. In fact, he testified that 14.9 percent was the number he came up with for comparable companies, and then used 7.4 percent to compare with Harrison. Well, Harrison, 7.4 was end-of-year equity. Average year equity was 12.33 percent. Given that comparison, it seems like he was either intentionally misleading the court or he just wasn't, I don't know, maybe he was just incompetent in coming up with his numbers. In fact, at one point when I asked him the question, he said, well, there are other imperfections in my report as well. Now, this is the IRS expert telling me, as counsel for the petitioner, that his report is flawed. And yet the judge ignored all that and just accepted his report almost verbatim. How do you deal with the argument that the compensation was not equivalent to that of comparable companies? With what, Your Honor? Was not equivalent to that of comparable companies on that factor. First of all, it does seem a little excessive for even a closely-held corporation of that magnitude that you would compensate somebody that much money. The company was bringing in during the audit years close to $26 and $27 million. I'm not sure you could look at her compensation and say that when she was making $600,000 a year, she was making $600,000 to $800,000 during the audit years, that that was excessive given what the company was bringing in. And on top of that, the expert, the so-called expert's opinion was that he was comparing it to companies that didn't have the sales and profit restrictions that a trash hauling business subject to municipal contracts has. For example, in Harrison & Sons, they have to go enter into a contract with, let's say, the city of Santa Barbara or the city of Ventura where the city sets their profit limit. So how can you compare that situation with a situation where a company is completely independent, going out in the marketplace and deciding their own profit? How is that an apples-to-apples comparison? It isn't. Mr. Carey disregarded all that. In fact, he was actually surprised on the witness stand when we told him that there was that restriction, that in fact assets and sales were regulated and that the company could not reflect, you know, a difference on those numbers, that the only real bottom-line number was return on equity that could fluctuate. Yet he had completely ignored that in the report. And in fact, the judge ignored that in his opinion. The judge tried to distinguish, and I'll cite you to the judge's footnote number six, where Judge Halpern basically said, well, let's look at all the different possibilities of standards that we could use to determine what the value of this company is. And one of them he used was return on assets or return on sales. But yet earlier in his opinion, he acknowledged that that number couldn't really fluctuate because that was based on the municipalities setting the fixed number of what that percentage would be. So how can you use those? You can't. Now, refresh me on the dividend history payment. There was no dividend ever paid. And in fact, you know, the court in Elliot's, which is the binding case in this circuit, and Exacto Springs, which is the case that we cite you to from the Seventh Circuit, says that no dividend history should not be, you know, considered as a factor, just because companies have a fixed number of dividends in the past doesn't mean that it should be, you know, a deciding factor in determining whether this should be a dividend or not. The final point I would like to make, Your Honor, and it really has to do with the Exacto Springs case and its relationship to the Elliot's case, the Exacto Springs case is not really that much different from Elliot's. I mean, we don't – apparently in Respondent's Brief, they seem to be under the impression that we're advocating a major change to the law in the Ninth Circuit. That is not the case. In fact, the Exacto Springs case in the Seventh Circuit looks to the Elliot's case in the Ninth Circuit and says the independent investor test, which was one of the factors in the Elliot's factors, we think that should be the first question asked. That should be the threshold question. Why? Because it's a more objective test and it gives taxpayers and accountants and CPAs and lawyers a better handle for what to advise their client. What is reasonable compensation? Is it just a battle of the experts or is it something that we can get our hands around and say, this is an objective test. If you clear this test, you should be fine. It should be a safe harbor. If you don't pass this test, then the other factors should be relevant. And that's what the Exacto Springs case did. It basically looked at the Elliot's case and said, here's a logical way to apply these factors. Let's see if there's a reasonable standard first up. And if there is, if a reasonable independent investor would have been fine with the rate of return of this company, let's look no less at the other factors. And that seems like an objective way to look at it. Might be that our Elliot's test controls in the circuit. Elliot's does control in the circuit. And we acknowledge that and we also say that under the Elliot's test, her compensation was not excessive. But we are asking this Court to go one step further. We're asking this Court to clear up this area and not allow this kind of confusion and the constant IRS coming in and determining whether or not your compensation by your board of directors is reasonable. Let's give taxpayers an objective test that they could look at with their CPAs and with their attorneys and say, okay, you know, you've crossed the line here or you haven't. And with that objective test, which I think Exacto Springs really presents, it will make life easier on all the taxpayers in this circuit. So we're not advocating for, you know, a reversal of Elliot's. We're asking for it to be tinkered with a little bit to provide a little more clarity, which we think Exacto Springs provides. I also just want to last comment on Exacto Springs, which seems to be a position of perhaps ambiguity to the tax court. An independent investor is not somebody who's standing here now looking to buy stock in a corporation. An independent investor is measured by the period that we're analyzing, the audit period, who already had pre-invested his money. Would he be happy with the rate of return on the money that he had previously invested? You can't look at fair market value of the company, because if you were, you'd have to say basically to the court right now, well, the company was worth $10 million, $17 million at X point in time. Now it's worth $26 million, you know, with regard to the revenue. Maybe it's worth $40 million on the open market if it was to be sold. We don't know. But we do know what management did with your money. We know what management did to get a rate of return, return on equity of your money. And that is what the independent investor test was supposed to be. That's what Elliott's talked about, and that's what Exacto Springs talked about. But I don't think the tax court judge understood that. Unless you have further questions, Your Honor, I submit. Thank you, counsel. Good morning. May it please the Court, I'm Karen Gregory for the Commissioner of Internal Revenue. As the panel has acknowledged, this Court uses a multi-factor test to determine reasonableness of compensation. It has identified five broad factors, which are the employee's role in the corporation and whether she has any special expertise that is important to the corporation's success, an external comparison of salaries paid by similar companies for similar services, the character and condition of the company, whether there's any conflict of interest, for example, a family relationship that would permit the corporation to disguise dividend distributions as employee compensation, and finally, the internal consistency of the corporation's compensation system. Comparing Mrs. Harrison's compensation, which ranged from $600,000 to $860,000 for the years in issue, to her actual duties performed during those years, indicates that her compensation was more closely related to her status as a principal owner of this company and not as an employee, and not as the actual services she performed as an employee. The record contains no explanation of why Mrs. Harrison's compensation was double that of her son's, who the tax court found were the ones who were actually running the company during the years in issue. Don't you concede that there's room in a corporation for a rainmaker, or in this case, perhaps a trashmaker? I'm sorry, I can't hear you. Don't you think there's room in these sorts of corporations for the role of a rainmaker? In other words, a person who doesn't, isn't operating the company, but is simply getting the business. I mean, that may be a critical role in somebody who does not otherwise appear to be doing the work. I mean, a classic example is in a law firm where you might have someone who brings in the business but actually does very little of the actual work. It's not unusual to compensate that person highly. That's correct. What's different from this company versus a law firm is this company was operating under long-term contracts and was the one who was actually running the business.  and for the municipalities. But Mr. Harrison was making double the sums before he died, and then she began making double the sums. As the sons? The sons, yes. Right. Well, the IRS did not challenge compensation for the prior years. There's no information on the record to explain what was going on there. And under Section 162A, the law says that the deduction is only available for reasonable compensation for services actually rendered. And that's for the years in issue. So the question is So assume for the sake of argument, I take your point on long-term contracts, but assume for the sake of argument that someone acquires $26 million worth of contracts and the rest of the company operates them. You would say under other circumstances that $600,000 to $800,000 of compensation on a commission would not be unreasonable. The taxpayer has the burden of proof here to show that the services provided were actually linked to the compensation paid. The record doesn't contain evidence that Mrs. Harrison's activities during the years in issue, as opposed to prior years, was actually driving the company's profits during the years in issue. And that was a primary reason that the task force found that the compensation paid to Mrs. Harrison was excessive. The other thing that was persuasive to the task force was the indicia of disguised dividends in this case, where you have a situation where compensation was established at the year end after profits were known, where approximately 93 percent of the corporation's net income before taxes and before compensation was being paid out as officer salaries, and where no dividend has ever been paid. Do you agree with Petitioner's argument that one shouldn't look at dividend history in this type of analysis? That one should not look at dividend history? Yes. This Court has held that the mere fact that no dividend was paid is not determinative. That was the issue in Elliott's. The case was remanded, and ultimately the compensation figure was affirmed in that case. But in another case, Pacific Grains, this Court recognized that where an expanding company has never paid dividends, that's something that needs to be considered. So it's not the lack of a dividend alone that is the problem here. It is all of the other factors. And the fact that the taxpayer did not meet its burden to come up with a methodology to support the numbers that it was paying to Mrs. Harrison, there's no explanation in the record whatsoever as to where those figures came from. As far as — There's a record in here that no compensation plan or bonus formula was used by the taxpayer. Is that essential? That is relevant to the internal consistency factor, which is the fifth Elliott's factor. And Mrs. Harrison admitted in her testimony that there was no formal compensation plan in place during the years in issue. I realize that. But if you miss that, if you don't have that, do you lose? That's a factor that would be very strongly in the government's favor if there's no formal plan and the company does not explain how its compensation was derived. The mere absence of a written plan is not dispositive. But the company must have a methodology. It has the burden to show that this compensation is reasonable. It has the burden of applying these factors and coming up with a number that is supportable based on what the employee is actually doing during the years in issue, what other companies are paying, and that external comparison factor is, in fact, in the regulations which implement the statute. So that's not just an optional factor that can be brushed aside when information is not available. Some effort has to be made on the taxpayers' part to justify their compensation. Well, one of the things here is that the employees received only a 2.8 percent increase during 1995, and Harrison's compensation increased 99 percent. And then the highest salary paid to a non-owner in 1995 was $76,639, whereas Harrison's compensation was $860,000. Now, it's hard to compare, but when you look at the salaries that CEOs are getting across the country compared to other employees in the company, they're pretty much out of proportion. Yes, it's wildly out of proportion. And the tax court found that that — I'm sorry, that those — Well, in this case, they did. But I'm saying if you look at CEOs across the board, you know, I live in Minnesota, and the CEO of 3M gets, I don't know the exact figure, but over a million dollars, and whereas the employees get very little, I mean, in comparison. And so my point is, if you look across the country and look at the salary CEOs are getting, some reach into the millions, $4 million, $5 million. There are very few employees that have a comparable compensation raise. So what's the IRS going to do? Investigate every corporation across the country and compare the CEOs' salary to what others are getting? There's a $1 million cap on deductibility of officer compensation, which didn't kick in in this place. So, yes, in other cases, companies may be paying a lot more to their CEOs, but not all of that is tax-deductible. There are lots of other rules and implications there which aren't an issue in this case. But as far as asking about the comparison of this salary to other salaries, I think Judge Leyer is certainly right that the salaries being paid to CEOs these days are things we never would have dreamt of a few years ago. They get higher and higher. They're astronomical. This doesn't seem to be so high compared to what I've been reading about CEOs' salaries in this country. And the other thing that bothers me about this case is it does not seem to be a woman who's sitting home and just being given money. They say she worked 40 hours a week for this company. That's not like an outside director at all. That's 40 hours a week. It seems like she put in a full-time job. And what did she do in this company for that 40 hours a week? If she was really working during that 40 hours a week, I assume it was sort of leading the company. The record doesn't reveal what precisely she was doing during those 40 hours a week. It does not show what she's doing? Other than she was attending meetings and so forth. The task force found that many of her responsibilities were generally ministerial. She was in charge of filing historic company records and that sort of thing and occasional Spanish translation services. In terms of her activities with respect to board meetings and acting on proposals, the record doesn't indicate what percentage of her time was spent on those activities. Just for purposes of comparison, James Harrison, one of her sons, worked 80 hours a week, and yet his compensation was half of what his mother's was. So that goes back to the concern about internal inconsistency. Yes, one would expect there to be some difference between, you know, the trash hauler's compensation and Mrs. Harrison's compensation, but why such a big discrepancy between her compensation and her son's compensation? Their roles in the company were essentially equivalent. They were all equal members on the board. Then if you brought it down to her son's compensation, that would be a different case also. But what was her son's compensation? It was $300,000 or $400,000. It was approximately half, yes. And she's cut down to something like $100,000. Well, the task force decision is subject to the clearly erroneous standard of review, which is a very deferential standard. We're just trying to make sense of it. We understand what the standard of review is. $100,000 seems completely unreasonable given the historic, the history of the company. $800,000 may be excessive, but $100,000 seems to be rather... It's less than everybody else. There's no real justification for that. Except to... She said she's equal to the others. If that's true, then it should be $300,000 or $400,000, unless the others are excessive also. Well, Ashley, her sons were much more active in the day-to-day operations of this company. This goes back to my question, though. If she's the face of the company, if she's the rainmaker, obviously she's not going to be involved necessarily in the day-to-day operations of the company, but she may be responsible for maintaining the good relations and ensure the long-term contracts. I don't know that, but that's not unusual for closely held corporations. I mean, at the end of the day, the problem is that you think these are disguised dividends, and it's a C-Corp, and if it had been incorporated otherwise, then you wouldn't have necessarily the problem, right? Right, because there would be some arm's-length transactions here. There would be independent people involved here. But let me ask you this. Given the uncertainties in this case and some of the discrepancies, is this a case that's appropriate for mediation by the circuit mediator? I'm trying to think back. This case was briefed quite a long time ago, but I believe that the initial letter with respect to mediator went out, and Taxpayers' Council indicated that they weren't interested in settling this case. I also believe at the tax court level that the tax court judge encouraged the department to settle. For whatever reason, they didn't. I wasn't involved at that level. Right. No, I'm just asking you now. It won't affect the decision one way or another, but I'm just – is that something the government would be willing to do if we decide that's a better option? There are a lot of procedures that we must follow, as you can imagine, within the government in terms of how those decisions can be made. And frankly, I'm not the person that can say that. That's fine. I'm sorry. As far as the point that Mr. Pance made with regard to Mrs. Harrison's position vis-à-vis an outside board chairman, the fact that the compensation figure in the surveys appearing in the government's expert report used figures for outside board chair, the fact that the chair was outside was not particularly relevant. It's just that those were the only figures available. The description of the services of a board chairman, which is Exhibit D to the expert report, describes them generically. There's no distinction between inside and outside. But there is a great deal of difference between compensation of inside and outside directors generally. Well, because generally inside directors aren't compensated. So the task force found that Mrs. Harrison's compensable services to the corporation most closely mirrored those of an outside board chair, which included signing contracts and so forth and participating in outside activities which will enhance corporate prestige and fulfill the corporation's public obligations as a member of industry and the community. What about a guarantee of the debts, $7 million or more? That's not typical of outside directors. In fact, that might be a prohibited activity, right? Well, first of all, there was no evidence that Mrs. Harrison was being compensated for her guarantees. The task force found that. No, my question was, is that more typical of an outside director, that would be the primary guarantor of the company? No, it would be more typical of an owner. And the bank's representative testified that its requirement for a guarantee was not solely based on Mrs. Harrison's status as an employee. She was seen as, you know, a person who could guarantee the money. She had the funds to do it. Also, the three sons signed identical guarantees. They're all jointly and severally liable. So there's no evidence that the guarantees, that anyone was being compensated for their guarantees. The task force found. No, but I think the point of that is, I understand your point, but it's difficult to say her duties were more consistent with an outside director when, in fact, she's a primary guarantor of the company. If her status as a guarantor warranted additional compensation, in this case, the task force found that it did not, because the taxpayer had not produced any evidence that the board was intending to compensate Mrs. Harrison for her guarantees for those years. The guarantees in the record were signed before and after the years in issue. So. I'm sorry. There were continuing obligations. There were continuing obligations. But it just would seem a little odd if historically she wasn't compensated for her guarantees and then suddenly she was, and the company had more money to pay. There's also, taxpayer did not argue that there was any undercompensation involved here. That was not raised as an issue. So in terms of what she was doing in the past, which admittedly helped get the company to where it is today, that's not what she's being paid for during the years in issue. The task force did recognize her. She was paid fairly substantially in the past also. It's just that there were five people instead of four being paid, and there was one above her, her husband. But she came, if I recall, it was her husband got the most, she got the next most, and then the sons. Right. And then when the husband died, she moved up somewhat. I mean, it seems to me the past was fairly consistent with what happened here. Well, but there was a huge her compensation basically doubled from the year prior to the pandemic. So did her sons. Everybody's doubled. Right. But her sons' compensation is not an issue here. So and we're going to go. But it just shows it's not that there's something unusual happened with her. What happened with her is what happened with everybody. Right. And the task force found that officer compensation generally was excessive. I'm running out of time. The taxpayer is the corporation. Correct. Right here. And so they pay, assuming you're correct. So you would disallow certain amounts of compensation paid to Harrison? As a deduction to the corporation. I want to emphasize very quickly, no one is trying to take anything away from Mrs. Harrison. If the company wants to pay her dividends, it's free to do so. What it can't do is deduct those dividend distributions as compensation. So it's just the company that has to pay as a deduction. I mean, disallow. The deduction would be disallowed. The deduction would be disallowed. And what does that come to in a corporate? I'm not a tax lawyer, but what's that come to about? I don't have it on me, but it's in the decision document that's filed in the tax court, and that sets forth the amount of the deductions that were disallowed for the years in issue. But what's the maximum a corporation pays for a dividend? Do you know? For the years in issue, I'm sorry, I don't remember. Now it's a lot less. There's been a change in the law, which doesn't affect this case, which has reduced the tax rate on corporations. Well, it would be the difference between $800,000 and $100,000 and going on down, right? So you pay the corporate tax rate on a difference of $700,000 going down to $500,000. So the total's paying tax on quite a bit of money. When you pay these CEOs or these corporations pay the CEOs, I wish I paid them, but I don't. But when the corporations pay the CEOs, the CEOs keep the money, but if you go after the corporation, their compensation would be disallowed as being excessive. I mean, I'm just talking abstractly. It depends on the facts of a particular case. Each one of these cases is decided on its own facts and circumstances. Just, I'm sorry, my time is up. Thank you. Thank you, Counsel. Is it possible for a minute of rebuttal? Yes. I just really have two points.  Mrs. Harrison would be found to make $21,000 more than the assistant shop foreman of Harrison & Sons. And, you know, that just appears to me to be a travesty. I mean, she's been working in this company since 1932 and built it from absolutely nothing to where it is now, and she's entitled to compensation, $21,000 more than the assistant shop foreman? That seems ridiculous almost. Now, is that paid to her as an employee or in compensation for her services, or is it paid to her simply as a dividend of the owner? Well, Judge Halpern found that she did work 40 hours per week or more, and that she was the public face. 40 hours. According to the record, I recall she worked 40 hours three days a week. No, 40 hours per week or more and came into the office three days a week. She also testified that she took work home and did work at home, reviewing contracts, et cetera. And also in the evenings, she attended all these functions besides coming into the office three days a week. So you've calculated the net tax difference. What is it? The bottom line is about $1.3 million with interest and penalties. Thank you, Your Honor. Thank you, counsel. The case just argued will be submitted. The Court will stand at recess for the day.
judges: Lay , Reinhardt, Thomas